```
                 UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF NEW YORK




----------------------------X
                            :
IN RE:                      :    09-MD-2120 (KAM)(SMG)
                            :
PAMIDRONATE PRODUCTS        :
LIABILITY LITIGATION        :    September 1, 2010
                            :
                            :    Brooklyn, New York
                            :
                            :
                            :
                            :
----------------------------X


          TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
            BEFORE THE HONORABLE STEVEN M. GOLD
               UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          DANIEL OSBORN, ESQ.
                            JOHN VECCHIONE, ESQ.


For the Defendant:          ROBERT JOHNSTON, ESQ.
                            JAMES HUSTON, ESQ.
                            ERIN BOSMAN, ESQ.
                            CRYSTAL MCKELLAR, ESQ.

Audio Operator:


Court Transcriber:          ARIA TRANSCRIPTIONS
                            c/o Elizabeth Barron
                            375 Salt Point Turnpike, #5D
                            Poughkeepsie, NY 12603
                            (215) 767-7700



Proceedings recorded by electronic sound recording,
transcript produced by transcription service
```

1          THE COURT:  This in In Re: Pamidronate Products

2     Liability Litigation, 09-MD-2120.

3          And I wanted to focus today on the plaintiff's

4     motion to extend time to amend the pleadings and the

5     plaintiff's motion to sever pleadings.  With respect to

6     those issues, who will be speaking on behalf of the

7     plaintiffs?

8          MR. OSBORN:  Your Honor, this is Dan Osborn, and

9     I'm happy to address the motion for additional time.  I

10    think the motion to sever sort of is subsumed in there, but

11    Mr. Vecchione may have some comments on the motion to sever

12    separately.

13         MR. VECCHIONE:  Yeah, that's mine, Your Honor.  If

14    there are any questions or comments about that, I will

15    discuss those.

16         THE COURT:  Thank you very much.

17         Who is on for the defendants and will be

18    addressing, for example, the issues raised in the

19    defendants' response to the plaintiffs' motion to extend

20    time, docket entry 27?

21         MR. HUSTON:  This is Jim Huston, Your Honor, with

22    Erin Bosman and Crystal Mckellar.  We're here on behalf of

23    APP.  I'd be happy to address those issues.  I'm sure many

24    of the other defendants would have comments as well.

25         THE COURT:  Thank you.  Mr. Huston, is it spelled

1    like the city?

2            MR. HUSTON:  It is not.  It's spelled like the

3    director.

4            THE COURT:  Director?

5            MR. HUSTON:  John Huston.

6            THE COURT:  Oh, yeah, yeah, got it.

7            Okay.  Now, let's start then with the motion for

8    extension of time.  What struck me, and I guess I'll direct

9    these questions to you, Mr. Osborn, is that I have this

10   defendants' response filed on August 23rd, docket entry 27,

11   and it raises some questions about things that the

12   defendants have been asking the plaintiffs to do that the

13   plaintiffs have not yet done, at least as of the date of

14   that filing.

15           For example, they have asked the plaintiffs to

16   identify which of them have not been able to locate

17   information about the generic Pamidronate supplier for their

18   infusions and to dismiss with respect to any plaintiffs for

19   whom it's been determined that they took only the brand name

20   Pamidronate, which as I understand it is the subject of a

21   different litigation and doesn't involve the defendants in

22   this case.

23           Did I understand, Mr. Osborn, in your view, the

24   two main concerns of the defendants correctly, and if so,

25   what is the plaintiffs' response to those issues?

1          MR. OSBORN:  Your Honor, I think the second one

2    you articulated is correct, which is, have we identified for

3    the defendants those plaintiffs who are not pursuing a claim

4    for whatever reason; either they didn't take a generic

5    product or they just elected not to because maybe they only

6    took a generic on two occasions and we decided it's not

7    worth pursuing a claim.  That's one group.

8          The first group, though, is not those persons who

9    we have not yet been able to identify the manufacturer,

10   because that's the ongoing process that we need more time to

11   do.  So anybody that we don't dismiss is necessarily --

12   we're still conducting the product identification efforts.

13         What the defendants have asked us to do -- and we

14   circulated two stipulations to them last week.  I wasn't

15   prepared to do it under their terms because if you were to

16   be privy to the correspondence, there was more to it than

17   that.  In any event, we circulated two stipulations to the

18   defendants last week.  One said, here are the plaintiffs for

19   whom we are prepared to dismiss the claims against all

20   generic defendant -- generic manufacturer defendants.

21         THE COURT:  How many of those are there?

22         MR. OSBORN:  I believe there are 30.

23         THE COURT:  All right.

24         MR. OSBORN:  We sent a second stipulation to the

25   defendants, identifying those cases in which we believe we

1    have identified the specific manufacturer or manufacturers

2    who provided the Pamidronate that our clients took, and with

3    that stipulation, we offered to dismiss the claims against

4    the other generic manufacturer defendants.  There are five

5    in this case.  In many instances, we've identified one or

6    two that we think are the culprit, and we're prepared to

7    dismiss the other two or three or four.  We that stipulation

8    around.  That covers, I believe, 17 people.

9          With the remainder, we're still conducting the

10   product identification, and that's what we need more time

11   for, and I think we've spelled out why.  I'm happy to get

12   into that if the Court has any questions.

13          THE COURT:  Mr. --

14          MR. VECCHIONE:  Vecchione.

15          THE COURT:  Mr. Vecchione, are you the one who's

16   addressing this issue?

17          MR. VECCHIONE:  Oh, no.

18          THE COURT:  Okay.

19          MR. VECCHIONE:  I'm for plaintiff.  I thought you

20   wanted to hear from defendants.

21          THE COURT:  No, I was trying to get to Mr. Huston.

22   I just wrote down all the names in a list without proper

23   attribution.  Forgive me.

24          Mr. Huston, did Mr. Osborn's remarks accurately

25   describe what you've received, and if so, what issues you

1   think are worth bringing to the Court's attention remain in

2   your August 23rd submission?

3           MR. HUSTON:  I think his comments were fairly

4   accurate.  He said that if the Court were aware of the

5   correspondence, you'd have a fuller understanding of it.  I

6   think the Court has the correspondence.  They were attached

7   to our --

8           THE COURT:  Yeah, but I didn't read it all.

9           MR. HUSTON:  I don't think you really need to.

10          THE COURT:  I want to know what you still need

11   that you don't have --

12          MR. HUSTON:  Right.

13          THE COURT:  -- that you think you reasonably

14   deserve.

15          MR. HUSTON:  The one thing that jumps out at me is

16   the process of getting the understanding that they have in

17   some cases and not in most of the others.  And that is the

18   state of affairs on what they do have in terms of product

19   i.d., what medical records they have.

20          There is an order in front of the Court, I

21   believe, from the May hearing -- no, before that -- that

22   required them to produce the medical records in a rolling

23   way; that once they receive them, they would forward them on

24   to us.  That I think was intended to allow us to not only

25   see what was going on and what medical records were being

1   obtained but also help on this product identification issue

2   by looking at MDC codes and billing records and the like.

3   Maybe we could help streamline it.

4           We have received some medical records from Mr.

5   Vecchione, but I don't believe we've received any from Mr.

6   Osborn.  The only correspondence we've received from him on

7   that that I recall right now is that he's asked us to pay

8   for the costs of those medical records, and we've been

9   corresponding about that.

10          But I think that is falling short of what the

11  Court was trying to accomplish, which is an exchange of

12  medical records as they came in.  We don't have any of them.

13  We don't have any amended complaints, which were required to

14  be filed.  That's the extension and I understand that.

15  We're sympathetic to the difficulty of getting some of the

16  medical records.

17          But it seems that the ones that have been received

18  should be produced, and it seems that those that can be

19  amended should be amended by all the plaintiffs, in terms of

20  the complaints.  And while we are happy to cooperate with

21  these dismissals and we've looked at them and defendants are

22  discussing them, we don't have the documents on which those

23  dismissals are based.  So we're assuming that they've got it

24  right, that they're going to have the correct defendants

25  still in the case.

1          We're a little concerned with being left in a case

2    that we shouldn't be or being in a case that we should not

3    be in, where other defendants who should be are out.  So it

4    would be nice to be able to see the medical records on which

5    those dismissals are based.  Those are my concerns.

6          THE COURT:  Mr. Osborn, is there any reason why

7    those shouldn't be made available for inspection and

8    copying?

9          MR. OSBORN:  No, Your Honor.  We've been -- we've

10   offered that for several months now, but we did want to be

11   reimbursed for a portion of the costs that we've incurred in

12   collecting these records.  Mr. Huston and I have

13   corresponded a couple of times.  When we send these

14   authorizations out or when we send these subpoenas out, on

15   most occasions I would say, we get charged by --

16         THE COURT:  That's all right.  You can make them

17   available for inspection and copying.  You don't hold the

18   documents hostage to a dispute over who's going to pay.  You

19   make them available for inspection and copying and if you

20   think you're entitled to something that the defendants won't

21   agree to, you make an application to the Court.

22         MR. OSBORN:  I'm happy to do that, Your Honor.

23         THE COURT:  All right, we'll proceed in that

24   manner and I'll expect them to be made available even before

25   the dispute over who pays for them is resolved.

1          MR. OSBORN:  Okay.

2          THE COURT:  All right?

3          MR. OSBORN:  Yes.

4          THE COURT:  Mr. Huston, is there anything else in

5     your August 23rd submission you'd like to raise with me?

6          MR. HUSTON:  We have the issue of the updated

7     chart, Your Honor.  That was something that Your Honor had

8     requested and that we would find helpful that we have not

9     received.  The chart on whose records have been obtained and

10    the progress on the product identification.

11         THE COURT:  Is that not readily inferrable from

12    the stipulations Mr. Osborn previously described?

13         MR. HUSTON:  No, it's not.

14         THE COURT:  Mr. Osborn?

15         MR. OSBORN:  I don't know why it wouldn't be.  In

16    the stipulations, we say, we're prepared to dismiss these

17    people for whatever reason.  And with respect to those for

18    which we've identified the manufacturer, we say, we're

19    prepared to dismiss defendant X, Y and Z.

20         THE COURT:  Yeah.

21         MR. HUSTON:  There are numerous others that we

22    have no information on whatsoever, and we'd like to have the

23    update on them.  It was our understanding that that's what

24    the Court requested.

25         THE COURT:  Well, I assume that with respect to

1   the others, product identification efforts are ongoing.  The

2   records that have been secured will be made available

3   regardless of any debate over who should pay what amount

4   toward them.

5           Am I right in the inference I draw, Mr. Osborn,

6   that you're still making product identification efforts with

7   respect to every plaintiff who is not in one of those stips?

8           MR. OSBORN:  That's correct, Your Honor, and the

9   reason it's taking so long -- and I'll just, if you'll

10  indulge me for 30 seconds --

11          THE COURT:  Yeah.

12          MR. OSBORN:  Last January, we told the Court that

13  the critical piece of information, in our view, was the

14  wholesaler, the identification of the wholesaler.  We have

15  the manufacturer, goes to the wholesaler, wholesaler goes to

16  the infusion center, where our clients get infused.  They

17  never see a label, they never see a package (ui).

18          THE COURT:  Yeah.

19          MR. OSBORN:  The wholesaler information was

20  critical.  We begged and pleaded with the defendants to

21  voluntarily turn over that information and they absolutely

22  refused.  When Mr. Huston says that they're trying to help

23  us identify, I couldn't think of anything further from the

24  truth in this case so far.

25          THE COURT:  Well, there's no need for that kind of

1  rhetoric at this stage.

2          MR. OSBORN:  Your Honor, the only reason I raise

3  it is because in Mr. Huston's letter or in the defendants'

4  opposition, they say that we should have been doing this

5  wholesaler stuff months ago, but we couldn't because we

6  didn't have the names.  We just got those in July and we

7  have now started sending out subpoenas for the wholesalers.

8  That's why there's this big lag time, because we just got

9  the stuff that we've been asking for since January.

10         THE COURT:  All right.

11         Getting back to Mr. Huston's request for the

12 chart, I think you said that I was correct to say that if --

13 the plaintiffs fall into three categories.  Either they're

14 agreeing to dismiss their claims because they didn't take

15 generic Pamidronate or for other reasons personal to them;

16 2) they've identified one or more specific Pamidronate --

17 generic Pamidronate manufacturers and they're limiting their

18 claims to the ones that they've identified; or 3) product

19 identification remains underway.

20         Does that cover the universe, as you understand

21 it, Mr. Osborn?

22         MR. OSBORN:  Yes, sir.

23         THE COURT:  And the first two categories, those

24 who are dismissing and those who've identified specific

25 generic manufacturers whose Pamidronate was administered to

1  them, are listed on the stipulations.  And every plaintiff

2  who isn't listed took generic Pamidronate -- may have taken

3  generic Pamidronate and product identification is still

4  underway.

5          MR. OSBORN:  Correct.

6          THE COURT:  Mr. Huston, what would be on the chart

7  that's not encompassed by that?

8          MR. HUSTON:  I would like to know the progress, if

9  any, that's been made on all of those that remain so far

10 unidentified.

11         THE COURT:  Well, all of the medical records that

12 have been obtained are available for your inspection review

13 at a mutually convenient, prompt time.  I don't see the

14 point of a narrative description of the status of all of the

15 other plaintiffs, but you can certainly look at every

16 document that they've obtained from a third party with

17 respect to those plaintiffs at your convenience.

18         MR. OSBORN:  This is Mr. Osborn.  We do -- when we

19 send out subpoenas, we do send copies of the subpoenas to

20 defense counsel, so they see where we're sending subpoenas

21 out.

22         THE COURT:  Okay.  Now that you've started to get

23 returns on them, you'll make the returns available as well.

24 Hopefully, that will help Mr. Huston get a clearer picture

25 of where you are.

1          So let's talk about severance for a minute.  I

2   understand that that's uncontested.

3          Who's going to talk about that on the defendants'

4   side?

5          MR. HUSTON:  We don't have any problem with that,

6   Your Honor.  It's a procedural step.  It's appropriate.

7          THE COURT:  Now, I assume -- I just have some case

8   management questions that I guess I'll address to Mr.

9   Vecchione.

10         MR. VECCHIONE:  Yes.

11         THE COURT:  I'm assuming that although you want to

12  sever pleadings, we're still going to proceed for case

13  management purposes under one, consolidated MDL number, in

14  terms of the filings with the Court and when we hold

15  conferences.

16         MR. VECCHIONE:  That is correct.  I only want what

17  I'll call a sub-file.  So that for instance, I may have one

18  case that's in Mr. Osborn's category of time to dismiss,

19  okay?

20         THE COURT:  Right.

21         MR. VECCHIONE:  I will then get a stipulation

22  together and we will -- I'll dismiss that one, but I won't

23  have a bunch of plaintiffs on -- they will have their own

24  number.

25         THE COURT:  I see.

1          MR. VECCHIONE:  All right?  So -- and then there's

2     going to -- I think about -- maybe about a third of mine,

3     I'm not sure, you know -- I want to amend the complaint and

4     drop some and put in others.  And I think it will be far

5     easier -- now, I'm not going to have all the same

6     defendants.  The defendants will differ.  Amendments will

7     need to be put in, so I think it's time to sever and do that

8     individually.

9          THE COURT:  Well, I'm not opposed to that in

10    principle.  I'm just a little concerned, looking down the

11    road, about the following:  I don't want to suggest, by

12    approving the severance motion, that I'm surrendering the

13    possibility of joint adjudication of issues in common.

14         MR. VECCHIONE:  Nor would I expect you to, Your

15    Honor.  That's not my intent.

16         THE COURT:  So if the defendants move for summary

17    judgment, for example, on the grounds that the plaintiffs'

18    Dalbert expert on causation doesn't meet the standards for

19    admissibility and there's no other proof of causation, I

20    assume that we all understand that that could be handled, if

21    the Court approves it or demands it, on a consolidated basis

22    that would be binding on a res judicata theory against all

23    of the plaintiffs, regardless of separate pleadings.

24         MR. VECCHIONE:  I would want to look at that but I

25    believe that's how it's normally done in what I call case-

1    wide experts.  In other words, the plaintiffs and the

2    defendants have what are called case-wide experts; for

3    instance, does this drug cause this disease, rather than,

4    did this drug cause this guy's disease?

5              THE COURT:  Right.

6              MR. VECCHIONE:  I think that's the way it goes,

7    Your Honor.

8              THE COURT:  Well, I guess I just wanted to say it

9    out loud to everybody on the record, because I don't want

10   anyone to be able to argue that the Court's approval of this

11   severance motion implies approval or suggests or caused

12   reasonable reliance by plaintiffs on the suggestion that all

13   issues would now be handled on a plaintiff-by-plaintiff

14   basis, without the Court's authority to consolidate or

15   approve a request to consolidate issues for motion practice

16   or trial.

17             MR. VECCHIONE:  There's no (ui) here, Your Honor.

18   We agree.  I did not intend by my --

19             THE COURT:  Good.

20             MR. VECCHIONE:  It was purely an administrative

21   convenience.

22             THE COURT:  Okay.  I understood it that way but I

23   just wanted to be clear with everyone and to give everyone a

24   record to go back to.  I know these litigations sometimes

25   take a long time to resolve.  Some of the players from the

1    beginning aren't there at the end and I'm involved in

2    another MDL where we're sort of scratching our heads about

3    what we meant five years ago when we said something.  That's

4    my goal in articulating this today.

5          So I will grant the motion for the severance on

6    the understandings that we've just articulated.  I don't

7    think there's anything for me to grant -- I'll grant the

8    motion for extension of time, subject to the discussion we

9    had today about the plaintiffs' willingness to make

10   discovery and being advised of the two stipulations that

11   plaintiffs submitted.

12         Is there anything else anybody wants to bring up

13   while we're all together on the phone?  Plaintiffs?

14         MR. OSBORN:  No, Your Honor.

15         THE COURT:  Defendants?

16         MR. JOHNSTON:  Your Honor, this is Robert Johnston

17   for Sandoz from Hollingsworth LLP.  I just have one

18   question.

19         In severing the severance, it's my understanding

20   that the plaintiffs represented by Mr. Vecchione do not

21   intend to file currently amended complaints.  I think that's

22   an administrative challenge that we should at least all be

23   on the same page on because normally, when you sever, you

24   file an individual complaint for the severed case.

25         THE COURT:  Mr. Vecchione, I'm not sure I followed

1    what Mr. Johnston was saying.

2         MR. VECCHIONE:  I did, and I do not intend -- in

3    other words, in order to file an amended complaint, I merely

4    want these cases -- each group that I put in my motion

5    assigned a new number by the clerk underneath the MDL.  They

6    will go on the same complaint they've always had and then,

7    when that's done, I will amend the others individually, as I

8    get information or hopefully all at once.

9         MR. JOHNSTONE:  Your Honor, my issue with that is

10   that this Court's order setting a deadline for amendment was

11   intended to insure that, to the extent the plaintiffs

12   already know parties who should be dropped, they're dropped.

13   And Mr. Vecchione knows, for example, a number of cases

14   where Sandoz should not be a defendant anymore, and this

15   procedure is going to allow him to sever without

16   effectuating a dismissal of folks that he already knows or

17   his client already knows should be dismissed.

18         THE COURT:  I'm sorry, I guess I'm under a mis-

19   impression then.  I thought that Mr. Osborn told me that

20   stipulations were forwarded dismissing the claims of

21   plaintiffs who either have determined they didn't take

22   generic Pamidronate or were not pursuing their claims, and

23   limiting the claims of specified plaintiffs where the

24   particular generic Pamidronate manufacturer whose drug was

25   administered to him or her has been identified.

1          MR. JOHNSTONE:  That's correct, Your Honor, Mr.

2     Osborn has done that.  That has not happened with respect to

3     Mr. Vecchione's plaintiffs.

4          THE COURT:  I didn't realize we weren't moving in

5     tandem in this respect.

6          MR. VECCHIONE:  Your Honor, I have not -- I have

7     not done that.  I have a limited number of plaintiffs and I

8     want to be severed so that I can administratively do it in a

9     more -- in a manner I thought it would be better to keep

10    track of.  I had hoped to do this all at once; I didn't want

11    to do it in dribs and drabs is my -- was the purposes of

12    this.

13         THE COURT:  Well, I don't mind if it's more

14    convenient for you to do it at once, but why shouldn't you

15    at least forward -- then forward the chart that Mr. Huston

16    was talking about, that Mr. Osborn persuaded me is mooted by

17    what he's already done but you haven't?

18         MR. VECCHIONE:  Your Honor, I don't have any

19    objection to doing that.  I had suggested another way for my

20    limited amount of plaintiffs, but I don't have a big

21    objection to it.

22         THE COURT:  Well, I don't care; anything that gets

23    the defendants the information about what to expect and

24    makes the underlying documents available to them so they can

25    talk to you if you're proceeding on what they perceive to be

1    an error is fine with me.

2                MR. VECCHIONE:  All right.

3                THE COURT:  As long as it's sufficiently

4    communicated.

5                MR. VECCHIONE:  I'd like two weeks to put together

6    my chart and make -- to do that, but yes, I could do that.

7                THE COURT:  All right.

8                Do we have a date that brings us back together

9    again?

10               MR. HUSTON:  We do.  It's September 8th, Your

11   Honor.  It's Jim Huston.  I was wondering if we really need

12   to get together on the 8th, given the progress we've made

13   today.

14               THE COURT:  It doesn't sound like it makes sense

15   to do that.  Does anybody anticipate needing a conference on

16   the 8th?

17               MR. OSBORN:  No, Your Honor.

18               MR. JOHNSTONE:  No, Your Honor.

19               THE COURT:  When will the -- how much time am I

20   extending this process for again?

21               MR. OSBORN:  I believe it's October 20th, Your

22   Honor.

23               THE COURT:  So does it make sense to push our

24   September 8th conference into November, after that process is

25   over?

1              MR. OSBORN:  This is Dan Osborn.  I think so.

2              THE COURT:  Let me open my calendar, if you'll

3     bear with me for a minute while my computer catches up to

4     us, and we'll look for a date in November when we can meet.

5              (Pause in Proceedings)

6              THE COURT:  How do you like Tuesday, November 9th

7     at 2:00?

8              MR. VECCHIONE:  Your Honor, this is John

9     Vecchione.  If I may attend by conference phone, that would

10    be fine.  There's a trial going on that I may -- I'll be at,

11    but I'm sure I can take a break to do that.  I don't want my

12    schedule, which is very busy in November, to hold this up.

13             THE COURT:  Is there anybody -- I don't have an

14    objection to that.  Is there anybody else who would find

15    that a difficult date?  All right.

16             I would like to get letters from you identifying

17    the issues you would like to raise with the Court by

18    November 3rd and responses to those letters by November 5th,

19    so that we have an opportunity to hit the ground running

20    when we meet, okay?

21             MR. OSBORN:  Yes, Your Honor.

22             THE COURT:  Thanks very much, everybody.  Enjoy

23    the rest of your summer, which I guess is down to about 48

24    hours or so, and I'll see you in the fall.

25             MR. OSBORN:  Thank you, Your Honor.

1           MR. HUSTON:  Thank you.

2           THE COURT:  Goodbye.

3                    * * * * * * * * *

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18     I certify that the foregoing is a correct transcript

19  from the electronic sound recording of the proceedings in

20  the above-entitled matter.

21

22

23

24

25  ELIZABETH BARRON                    October 14, 2010